AUSTIN C. REESE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reese v. Commissioner
Docket No. 8746-74.
United States Tax Court
T.C. Memo 1977-411; 1977 Tax Ct. Memo LEXIS 32; 36 T.C.M. (CCH) 1665; T.C.M. (RIA) 770411; November 29, 1977, Filed *32 Held: Petitioner's unreported income from sales of heroin in the latter part of 1971 and the early part of 1972 redetermined. Petitioner's failure to report this income was due to negligence or intentional disregard of rules and regulations. Held,further, petitioner did not receive wages from Club Society in 1972 but did receive $576.15 in wages from International Harvester Co. in 1972. Held,further, petitioner is not entitled to personal exemptions for his son and two daughters. Held,further, petitioner's failure to file a Federal income tax return for 1972 was not due to reasonable cause. Austin C. Reese, pro se. Robert E. Touchton, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax under sections 6651(a) and 6653(a), I.R.C. 1954, [1] as follows: Additions to tax Year
Deficiency
sec. 6651(a)
sec. 6653(a)
1971
$40,654.86
$2,032.74
1972
34,808.54
$8,702.14
1,740.43 The issues presented for decision are: (1) Whether respondent's *33 reconstruction of the amount of taxable income realized by petitioner from sales of heroin during the taxable years 1971 and 1972 should be upheld. (2) Whether petitioner received certain wages from the Club Society which were not reported on his 1972 income tax return. (3) Whether petitioner received wages in the amount of $576.15 from the International Harvester Co. in 1972 which he did not report as taxable income. (4) Whether petitioner is entitled to personal exemptions for his son and two daughters as claimed on his 1971 Federal income tax return. (5) Whether petitioner failed to file his 1972 Federal income tax return within the time prescribed by law and, if so, whether that failure was due to reasonable cause. (6) Whether the underpayment of tax by petitioner for each of the taxable years 1971 and 1972 was due to negligence or intentional disregard of rules and regulations. FINDINGS OF FACT During the years 1971 and 1972 petitioner resided in Fort Wayne, Ind. Petitioner filed an individual income tax return for the calendar year 1971, on the cash basis of accounting. Petitioner did not file an income tax return for the year 1972. From October 1971 to March 9, 1972, petitioner *34 sold drugs. About one-third of petitioner's sales to users was made by petitioner at his home; the balance of his sales was made through "pushers" selling on the streets. Petitioner used four to six pushers at various times during the 5-to 5-1/2-month period above. Petitioner was arrested for drug violations at his home on January 18, 1972, and on March 9, 1972. He was convicted on these charges--sale of heroin--on October 17, 1972, and on July 3, 1973. He was sentenced to the Indiana State Prison for terms of 5 to 20 years on each occasion. Petitioner was in the Indiana State Reformatory, Pendleton, Ind., at the time the petition and amended petition were filed in this case and at the time of the trial in this case. [2]
For several years prior to 1972 and until January 18, 1972, petitioner was employed by International Harvester Co. in Fort Wayne. However, petitioner worked only a total of 24 days during October-December 1971, and only 1 day in January 1972 at International Harvester. Petitioner was not employed during the remainder of 1972. During the relevant *35 period petitioner purchased cut heroin in various amounts, cut it further, packaged it in aluminum foil packets containing approximately one-ninety-sixth of an ounce of heroin mixture, [3] and sold it in those packets, each packet constituting one "shot." The cut heroin petitioner purchased (hereinafter referred to as heroin) was a good grade containing about 25 percent heroin and 75 percent milk sugar or some other nonheroin mixture. Petitioner usually cut the heroin he purchased four or five times before it was packaged for sale. Each cut adds an equal amount of mixture to the heroin being cut; thus if 1 ounce of heroin was cut 4 times petitioner ended up with 5 ounces of the cut heroin mixture. If the ounce that was purchased contained 25 percent pure heroin the 5 ounces of mixture produced as a result of four cutting processes contained about five percent pure heroin. Petitioner's activity in the drug market *36 came to the attention of the Fort Wayne police in November 1971. The narcotics squad placed petitioner's residence [4] *37 under constant surveillance for 12 to 14 hours per day from January 2, 1972, until March 9, 1972, using at least 2 two-man teams. One team started the surveillance at about 3 p.m. and was relieved by the second team at 10:30-11:00 p.m., the second team continued the surveillance for 4 to 5 hours. The police also obtained information with respect to petitioner's drug activities from prostitutes and other people on the streets. The information obtained suggested that petitioner was a large drug dealer. The night team on the surveillance watch observed 15 to 18 people entering petitioner's residence during week nights and up to 30 people [5] entering on Friday and Saturday nights. These people stayed in the house only 4 to 5 minutes. Among those entering the premises were four known pushers. One of the objectives of the narcotics squad was to have someone working with them make one or more "controlled buys" of drugs from petitioner. Bernard J. Brita, a witness for respondent, was a former drug user who kicked the habit about the first of the year 1972. During October through December of 1971 Brita purchased heroin from petitioner, at first through a pusher and then directly from petitioner at his home. He went there at night but on other occasions he purchased heroin from petitioner in the mornings and afternoons. He usually paid petitioner in cash but occasionally he paid with merchandise *38 such as a TV set, hi-fi recorder, etc., On a number of occasions when Brita was at petitioner's house he observed other people in the house buying heroin. In early 1972 Brita offered to help the police in their efforts to stop the narcotics traffic. On the night of January 12, 1972, Brita agreed to and did make a controlled buy from petitioner at 1708 Oxford Street. After thoroughly searching Brita, the police took him to petitioner's home to buy heroin. They gave him $15 to purchase heroin. Brita entered the house, bought one packet from petitioner for $15 and returned to the police car, where he gave the police the packet. He was again thoroughly searched by the police. The packet was taken to the police laboratory where it was determined that it contained a mixture that tested out to be about 5 percent pure heroin. Ron Harnishfeger, another witness for respondent, was also a former drug user who quit using it early in 1972 and agreed to help the police. He, too, had purchased heroin from petitioner during October-December 1971 and went to petitioner's home several times a week for this purpose. He was usually accompanied by one or two other users who pooled their resources *39 to buy heroin in larger quantities. They usually paid petitioner $15 for a packet of the heroin but at times could buy it for $10 a packet if they bought larger quantities. He believed that petitioner cut the 25 percent heroin he purchased four or five times and sold the packets to his pushers for $10. On the night of February 14, 1972, Harnishfeger agreed to make a controlled buy of heroin from petitioner for the police. The procedure followed was similar to Brita's except that the police gave Harnishfeger $25 and he bought 2 packets for $20 and returned them and $5 change to the police. These packets also tested out to be about 5 percent heroin. At about 10 p.m. on January 18, 1972, the Fort Wayne police, armed with an arrest warrant and a search warrant, raided petitioner's residence at 1708 Oxford Street. A search of the house disclosed small amounts of heroin mix in three places, some barbituates and LSD, and some lactose mix used for cutting the heroin. At about 2:20 a.m. on March 9, 1972, the police again raided petitioner's residence which was then at 2712-1/2 Weisser Park. On this occasion petitioner attempted to get a gun from under a pillow on a bed but did not get *40 it in time. A search of the premises turned up two loaded revolvers and, under the mattress, a pouch containing 1.9 ounces of heroin wrapped in packets. The police also found nine "bindles" of cocaine, paraphernalia for cutting and packaging heroin, and a number of air conditioners, stereos, and TV sets. Later petitioner was tried and convicted of violation of the narcotics law as a result of both of the above-described raids. In the Fort Wayne area during the latter part of 1971 and the first 3 months of 1972, heroin bought in bulk by dealers contained about 25 percent heroin, the rest being mixtures of various sorts. An ounce of this 25 percent mixture cost from $800 to $1,000. Under the best conditions this mixture could be cut 6 or 7 times and sold on the market. A shot of heroin mixture containing 5 percent heroin was readily salable for $10 to $15. A quarter ounce of 25 percent heroin mix cut four times would produce 24 shots or packets with a 5 percent heroin mix. ULTIMATE FINDINGS OF FACT Petitioner realized taxable income from the sale of heroin in the amount of $63,800 during 1971 and in the amount of $55,100 during 1972, which he failed to report on an income tax *41 return. Petitioner's failure to report this income was due to negligence or intentional disregard of rules and regulations. Petitioner did not receive wages from Club Society in 1972. Petitioner did receive wages in the amount of $576.15 from International Harvester Co. in 1972. Petitioner's failure to file a Federal income tax return for 1972 was not due to reasonable cause. OPINION The principal issue is whether petitioner had taxable income from the sale of heroin in 1971 and 1972 and, if so, the amount thereof. Petitioner did not report any income from the sale of heroin on the return he filed for 1971 and he did not file a return for 1972. In his notice of deficiency respondent determined that petitioner had net income in the amount of $79,200 in 1971 and in the amount of $68,400 in 1972 from the sale of narcotics. This is a question of fact that we have had to determine from a record that leaves much to be desired. Petitioner had been in prison for 4 years before the trial, was not represented by counsel, and presented only himself as a witness. Respondent offered the testimony of four witnesses, two Fort Wayne police officers who had participated in the surveillance of *42 petitioner's home and in the two raids and controlled buys, and the two individuals who had previously purchased heroin from petitioner and also made the controlled buys, all of whom for the most part recited the facts we have included in our findings above. Those facts were obviously adequate to convict petitioner of criminal charges of selling heroin, but they are rather speculative for the purpose of trying to determine how much income petitioner realized from the sale of heroin. But since petitioner apparently kept no books or records of his drug activities, respondent was justified using, nay, was forced to use, what evidence and method he could find to determine that income.As long as the method of approximating income is not arbitrary and clearly reflects income to the best of respondent's knowledge, respondent may use such method and the burden is on petitioner to prove that respondent's determination was either arbitrary or was in error. Petitioner's testimony was of no value in determining his correct income, and did not prove that the method used or the result reached by respondent was arbitrary or unreasonable. He admitted that he was selling heroin but gave no details *43 of how he conducted his drug activity, how much heroin he bought and sold, or how much he paid for the heroin he bought and how much he charged for the heroin he sold. The main thrust of his testimony was that he lost money in the drug business and that it was impossible for him to have generated the income respondent says he had in the approximately 2-1/2 months of each of the years before us. His explanations for this go beyond the realm of credibility and are contrary to the mutual corroboration and unimpeached testimony of respondent's witnesses. Specifically, we cannot accept petitioner's testimony that he cut the heroin he bought only once, that his pushers were obligated to pay him only 50 percent of their selling price after they made their sales, that he sold only a quarter ounce of heroin a week, and that it would have required more money than he had for start-up expenses. An ounce of heroin cost $800 and petitioner did not explain what other start-up expenses he would have had except the relatively inexpensive paraphernalia needed to cut and package the heroin. This cost could have been recovered in the first few days of sales. Furthermore, in explaining deposits in *44 his bank account, petitioner testified that he had saved $10,000 from his wages which his grandfather had held for him until he died, and then he had had to deposit it in the bank in small amounts to avoid suspicion. Petitioner's testimony was too inconsistent and incredible to give it much weight. While we do not find respondent's method of calculating petitioner's income to be arbitrary or unreasonable, we think respondent misapplied some of the evidence in making his calculations and we think it is our duty, under these circumstances, to redetermine petitioner's taxable income even though petitioner has not, on his own evidence, carried his burden of proving error in respondent's determination. [6] In the notice of deficiency respondent used a formula for determining petitioner's income from the sale of heroin which was as follows: Computation of Income - Sale of Narcotics 1971
Sales: 6 oz. high-grade Heroin per week 6 oz. cut *45 5 times = 30 oz. 1 oz. provides 80 shots 30 oz. X 80 shots per oz. = 2,400 shots 2,400 shots at $5.00 per shot = $12,000.00 per week October 15, 1971 to December 31, 1971 = 11 weeks 11 weeks X $12,000.00 = $132,000.00 gross receipts Cost: $800.00 per oz. 6 oz. per week X 11 weeks = 66 oz. 66 oz. X $800.00 = $52,800.00 cost Gross Income
$132,000.00
Less: Cost
52,800.00
Adjustment
79,200.00
1972
Sales: 6 oz. high-grade Heroin per week 6 oz. cut 5 times = 30 oz. 1 oz. provides 80 shots 30 oz. X 80 shots per oz. = 2,400 shots 2,400 shots at $5.00 per shot = $12,000.00 per week January 1, 1972 to March 9, 1972 = 9 1/2 weeks 9 1/2 weeks X $12,000.00 = $114,000.00 gross receipts Cost: $800.00 per oz. 6 oz. per week X 9 1/2 weeks = 57 oz. 57 oz. X $800.00 per oz. = $45,600.00 cost Gross Income
$114,000.00
Less: Cost
45,600.00
Adjustment
$ 68,400.00
On brief respondent acknowledges that there were two errors in this calculation. First, that cutting 6 ounces of high-grade heroin 5 times produced 30 ounces of mixture. The evidence indicates that each time the original quantity is cut an amount of mix equal to the original quantity is added. Cutting 6 ounces 5 times would thus produce 36 ounces. This *46 would work to petitioner's disadvantage dollar wise but would also increase the number of shots that had to be sold to dispose of 6 ounces in a week--and the number for a one-man operation such as petitioner's was already pretty high. Secondly, the formula used in the notice of deficiency used a price of $5 per shot sold, whereas the evidence indicates that each packet, or shot, was sold for either $10 or $15. On brief respondent revised his computation by substituting 2 ounces for the 6 ounces of high-grade heroin sold per week, reducing the number of cuts from 5 to 4, but substituting sales prices of $10 and $15 per shot for the $5 per shot used in the above calculation. Respondent points out that the revised calculation produces about the same gross receipts, but fails to make it clear that by reducing the amount of heroin purchased to produce the same gross receipts petitioner's cost of goods sold is reduced, thus producing a larger net income. However, respondent does not seek an increased deficiency. In support of his revised calculation using 2 ounces of high-grade heroin sold per week, respondent attempts to show that this is a reasonable estimate by calculating the number *47 of buyers that would be needed to absorb this much and comparing it with the number of buyers available based on the testimony of the police officers. Starting with 2 ounces per week cut 4 times and multiplied by 96 shots per ounce, he arrives at 960 packets sold per week. Assuming that each buyer would purchase two packets this would require 480 buyers (respondent used 430) to absorb the 960 packets. Respondent then attempts to find the buyers. Using three buyers per hour observed by the police entering petitioner's house on week nights and multiplying that by 12 hours per day produces 36 buyers per day or 180 buyers Sunday through Thursday. For Friday and Saturday, respondent uses 12 buyers per hour, applying a reasonable adjustment to the 30 buyers per hour he says the police surveillance officer testified to. But if we are right that the testimony was really 30 buyers per night over 5 hours this would reduce the number of buyers available to 6 per hour on Fridays and Saturdays. Respondent multiplies his 12 per hour by 12 hours per day and produces 288 buyers for the 2-day period. Adding this to the 180 weekday buyers respondent produces 468 buyers per week, which is still *48 a little short of the 480 buyers needed. But if six buyers per hour on Saturdays and Sundays is used in the calculation instead of 12 per hour for the reason above stated, it will produce only 144 buyers on the weekends and, when added to the 180 buyers during the week, produces only 324 buyers instead of the 480 needed to absorb the 2 ounces. We also think the consistent use of 12 hours per day 7 days per week may be high. We have no testimony from members of the afternoon surveillance team with respect to how many people they saw entering the premises in the daylight hours. The big question mark is how much of the high-grade heroin petitioner bought and sold in a week. There is no firm evidence on this point. Respondent's method involves working backwards from the number of people observed entering petitioner's house. The police witnesses gave no basis for their estimates of 2 ounces per week. We think our figures can be supported by the evidence and produce a result more realistic than respondent's result. Starting with 300 buyers per week, an approximate number which we think the evidence supports, and assuming that each buyer would buy two shots, we arrived at the net *49 income figures stated in our Findings of Fact as follows: 1971
Sales: 1-1/2 oz. high-grade Heroin per week 1-1/2 cut 4 times = 7-1/2 oz. 1 oz. provides 80 shots (16 shots allowance for overhead) 7-1/2 oz. X 80 shots = 600 shots 400 shots at $10 per shot (to pushers) = $4,000 per week 200 shots at $15 per shot (to users) = 3,000 per week 600 shots $7,000 per week 11 weeks at $7,000 = $77,000 gross receipts Cost: $800 per oz. 1-1/2 oz. per week for 11 weeks = 16-1/2 oz. 16-1/2 oz. X $800 = $13,200 cost Gross receipts
$77,000
Less: Cost
13,200
Net income
$63,800
1972
Sales: Same as 1971 except for only 9-1/2 weeks 9-1/2 weeks X $7,000 per week = $66,400 gross receipts Cost: Cost (9-1/2 X 1-1/2 X 800)
11,400
Net income
$55,100
The 300 buyers per week we have used is close to the estimated number of people seen entering petitioner's residence per week by the surveillance teams, using 30 people per 5-hour shift on Fridays and Saturdays instead of 30 people per hour. The total number of people entering also seems more realistic to us than does the 480 people used in respondent's computation. We have concluded that the above net income figures more nearly approximate petitioner's income from the *50 sale of heroin during the 5-1/2-month period with which we are concerned than do respondent's figures. With regard to whether petitioner earned $5,875 in wages in 1972 from a tavern known as Club Society the evidence is again unsatisfactory. Respondent's determination is based on a statement alleged to have been made by petitioner to a probation officer making a presentencing investigation of petitioner after he was convicted. The probation officer did not appear as a witness and apparently made no effort to check out petitioner's statement that he had been so employed. Petitioner testified in this trial that he had made the statement simply because he thought it would help him in the probation officer's report to the sentencing judge, and that he had never worked for the Club and received no wages from it. Petitioner also testified in the criminal trial that he was unemployed during 1972 after he was arrested. Since respondent's determination is admittedly based on the rankest hearsay evidence and respondent made no effort to obtain affirmative evidence that must have been available to corroborate his determination, we accept petitioner's testimony as carrying his burden of *51 proof on this issue. There is no question that petitioner received $576.15 in wages from International Harvester Co. in 1972. This is based on the records of that company and petitioner does not really deny it. In fact, in his petition he admits receiving it but claimed that it was not a large enough amount to require him to file an income tax return. We recognize that the payment to petitioner in January of 1972 was probably in part payment for services rendered in 1971 but this does not exclude it from the taxable income of a cash basis taxpayer for the year in which it was received. The disallowance on his 1971 income tax return of petitioner's claimed dependency exemptions under section 151(a) and section 152(a)(1) [7] *52 for his three children is upheld because of petitioner's failure to sustain his burden of proof that he provided over half of the support for these children. The record does not give any clue as to the total amounts expended for support of these children other than his statement at this trial that he expended $30 per week for their support. This ambivalent and inconclusive evidence simply fails to establish that petitioner complied with section 152(a)(1). Petitioner admits in his amended petition that he did not file a Federal income tax return for the taxable year 1972. As the reason he alleged that he did not earn enough to require filing a return. At trial petitioner stated that he did file a return and later stated that he could not recall whether he did so or not. Credence must be given to his admission of failure to file in the amended petition, and the fact that respondent could not find a 1972 return that had been filed by petitioner. Respondent determined that the failure to file was not due to reasonable cause but rather willful neglect thereby allowing assessment of the addition to tax for failure to file a return prescribed under section 6651(a)(1). [8] Petitioner's stated reason for failing to file cannot be believed because of his income from the heroin sales of which *53 he obviously was aware. Clearly, this cannot be viewed as reasonable cause. Therefore, we hold application of the addition to tax under section 6651(a)(1) is correct. Respondent further asserts that petitioner's failure to maintain books and records, file a correct *54 return for 1971, and file a return for 1972 as required by section 6001 [9] was intentional, thereby justifying imposition of the addition to tax embodied in section 6653(a). [10] Respondent's contention is unassailable. Petitioner was dealing in contraband and he wanted his activities shielded from official scrutiny. Consequently, his failure to comply with section 6001 cannot be regarded as anything other than intentional. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise specified.↩
2. Petitioner attended the trial of this case and testified pursuant to a writ of habeas corpus issued by this Court.↩
3. The packets petitioner sold contained one-half of a quarter teaspoon or one-eighth of a teaspoon of the mixture. A quarter ounce of mixture equals 1 tablespoon, so 1 ounce equals 4 tablespoons, 1 tablespoon equals 3 teaspoons. Thus 8X 3X 4↩ = 96 or one-ninety-sixth of an ounce.
4. During the latter part of 1971 petitioner lived at 1708 Oxford Street. Prior to March 9, 1972, he moved to 2712-1/2 Weisser Park. There was a dispute between petitioner and respondent's witnesses as to when he moved but under the circumstances the timing is immaterial. 5. There is some confusion over whether the number of people observed entering petitioner's house on Friday and Saturday nights was 30 per hour or 30 per night. Witness Roberts, who was on the surveillance team, in response to a question, first answered that he observed 30 people per hour but then corrected it to 30 people per night. In his brief respondent uses 30 people per hour in his computations. We think it is more reasonable to believe that 30 people per night was the intended answer.If 30 people per hour entered the house and each stayed 4 to 5 minutes the house would have become overcrowded.↩
6. At the conclusion of petitioner's testimony, respondent indicated a desire to rest without putting on his evidence, but in light of petitioner's circumstances and the amount of the deficiencies the Court requested respondent to proceed with his witnesses.↩
7. Sec. 151(a) provides that "[in] the case of an individual, the exemptions provided by this section shall be allowed as deductions in computing taxable income." Sec. 152(a)(1) defines dependent as the son or daughter of the taxpayer over half of whose support for the calendar year in which the taxable year of the taxpayer begins was received from the taxpayer.↩
8. (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.↩
9. Section 6001 provides in part: "Every person liable for any tax imposed by this title * * * shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary or his delegate from time to time prescribes." ↩
10. Section 6653(a) provides: "If any part of any underpayment * * * is due to * * * intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment."↩